is number 23-50461 U.S. v. Turner. So, Ms. Kimmelman, whenever you're ready. Thank you, Your Honor. May it please the Court, Kristen Kimmelman for Jaunte Turner. Mr. Turner asked this court to vacate his convictions because the district court incorrectly denied his motion to suppress. This morning I wanted to first focus on the lack of exigent circumstances that then meant that the protective sweep was unlawful, and then the consequences of that given that we have a warrant that was later obtained in the application of Massey to the facts of this case. So, with regard to exigent circumstances, we know that there was a shot fired at 645 p.m. Over an hour later is when the officers entered Mr. Turner's apartment. And in that intervening time, Mr. Officer Bonnenberger, who was the first officer on the scene at the apartment hallway and area, learned a lot. He learned that the neighbor heard the commotion and people leaving the apartment where she thought the bullet came from at 650. And it was her ring doorbell that captured the movement on that of people leaving, although there was no video. And she had not heard any noise coming from that apartment since 650. When Officer Bonnenberger arrived at 723, he first spoke with the neighbor and then he went over to knock on the apartment where Mr. Turner lived, apartment 2204. He knocked several times. There was no answer. They also had an officer stationed outside of the apartment complex looking up at the windows to see if there was any light coming from the windows, you know, at night in January. Um, and there wasn't. So we know it was dark. There was no noise at 7 35. Officer Bonnenberger lets a different resident walk down the hallway in front of Mr Turner's apartment. And a minute or so later, he says, I don't think anyone's in there. It's been a lot of time they would have left already. And so that's what was the opinion that Officer Bonnenberger expressed after having been on the scene for some some time. He had also visited the apartment complex earlier and all things seemed calm, although he was on the third floor at that point. But counsel, at the same time, all of this is going on in your timeline. The police officers are finding out that there is a bullet hole that is coming from the next from that apartment at the same time. And they're also being notified that, in addition, living in that apartment are three people. Mr Turner, his girlfriend and a one year old. Is that correct? That's correct. And certainly there is information that they lived there, but there was no indication, no reasonable articulable fact that supported that they were in the apartment at that time. Of course, Mr Turner was talking with police outside on a bench outside the apartment, and there was nothing to indicate that his girlfriend or the child were in the apartment at that time. When Sergeant Roberts arrives at the scene, he eventually makes it up to the hallway and decides that the other apartments around apartment 2204 needed to be cleared. So that clearing took place a lot more knocking and motion. But again, still no noise or anything coming from apartment 2204. And then it's around 7 50 when Officer Bonnenberger calls Detective Corn, who again is not on site and relay some information. And Sergeant Roberts also contributes to that conversation, and they make the case that we need to go into the apartment to see who else might be there. I think Officer Bonnenberger actually says we don't know who else is in the apartment. Do we need a warrant or can we go in for the protective sweep? And Detective Corn, with the limited information that he was given from the officers on the scene, says you can do a protective sweep to secure the area, and then we can see about a warrant. And this is after the other apartments have been cleared, correct? Correct. So that clearing of the apartments is pretty good indication that the police believed there were exigent circumstances. Again, it's an objective consideration, not a subjective. So Sergeant Roberts certainly seemed to have that opinion, and he's the one who gave the order for the apartments next door to be cleared. But that also adds to the security of the situation because the bystanders are removed. It's been an hour at this point, and there's been no noise or movement coming from apartment 2204, which is very different than this court's cases where they have found exigent circumstances. Typically there's some sort of knock or approach by the officer, and then you hear shuffling, or the door is open and you see a gun and someone nearby the gun. You have some reason the person you're not looking for comes to the door, and you have reason to believe that a person is inside of that apartment with a gun. Those are the situations where exigent circumstances is supported and allow for the unwarranted search of an apartment. But that is a far cry from here. This is much closer to Menchaca Castrita, this court's case where there was no indication that anyone remained after the suspect had left. They knew the suspect left, and they didn't know that anyone else was in that apartment. Why wouldn't the bullet hole in the wall paired with the multiple reports of gunshots not be enough? So a few things. The bullet hole may be evidence of some crime, but not of the exigent circumstances that the evidence is going to be destroyed, or that someone is still remaining in the apartment with access to a gun to cause damage. And the multiple calls, there were several calls to the police, I believe two at least, but they all related to the same shot, and that is a fact that Officer Bonnenberger had clarified when he arrived on the scene. So it does... I think the second call was coded as a shooting in progress, which sounds alarming, but when the officers arrived, they realized the area was actually very calm, and indications were that people in the apartment had already left. What's our standard of review on the exigency argument? Interesting question. So in Tomas v. San Marcos, the court said, which is a 1983 case, the court said, looking at the... We've established the facts, that's clearly erroneous. But then applying to whether a reasonable person would have found exigent circumstances based on those facts, that is a legal question subject to de novo review. And here, for the most part, I think the facts are undisputed. Now, it is true in many of the court's cases in the criminal context, dealing with exigent circumstances, they focused more on clear error. And whether the district court's finding was clearly erroneous, I think that in this case, the finding was clearly erroneous because of the significant lag of time, and no indications that someone was still in the apartment. Coupled with, for exigent circumstances, is the amount of time it would take to get a warrant. And there were a few different opinions given by the officers in this case, ranging from, I think, 20 minutes was the fastest to two hours, or maybe days, if it's a significant warrant. But in average, I think the officer said it would take an hour and a half. So an hour had already passed. Did the circumstances rise to such that the officers couldn't wait another hour and a half to get that search warrant, to go in with that warrant? You mentioned Menchaca, Costa Rita? Yes. So in that case, did the police have any indication that there were, in fact, like in this case, people living there, including a minor child? I don't think they knew that. I'm not sure, but they knew that Mr. Menchaca was there, and he wasn't paying his rent, which is why the landlord came and visited. I don't think they knew whether he had other people in the apartment with him, and they had nothing to suggest that he had other cohorts there. So that possibly is a difference, but you still don't... I mean, certainly, our case, Menchaca, and other cases establish that you can't just have a mere possibility of somebody. I mean, if a shot is fired, and an hour later, officers come to a house knowing several people live there, but it's empty and no one answers, that does not seem like an exigent circumstance. Which brings up another question I have. Has the government forfeited the argument concerning emergency aid? I believe they have. They didn't raise it. To some extent, that is implicated in the exigent circumstances, but regardless, they wouldn't meet that standard because there is no strong evidence of an emergency or imminent need for medical attention. And again, Troop, the case says, that mere possibility that someone might be in there injured is not enough. So turning to the Massey question, we do have here, after the warrantless entry and sweep of the apartment, Officer Bonnenberger, again, that same officer who was first on the scene, is relaying facts to Detective Corn, who relays facts to Detective Soto and Soto actually completes the warrant affidavit and gets it assigned by the magistrate. Now, that warrant affidavit is relatively short, it's a paragraph, and it does say, of course, it has the bullet hole through the wall, and then a conclusory statement of someone inside in the apartment 2204 shot the firearm, and that to secure the scene, officers conducted a protective sweep and did not find anybody inside. What's lacking from the warrant affidavit in terms of Massey, where the agent was very forthcoming about the timelining of events and what the facts were on the scene, is that there's no timeline, there are not the facts of why the officers thought a protective sweep was necessary, and there's no facts about, at least before the unwarranted search, officers were freely discussing on the body cam other possibilities of where the bullet could have come from. And so this short warrant lacks that good faith frankness about the facts that would allow a magistrate judge to determine whether or not there was an unlawful search. So I've skipped ahead to that second question. There are two prongs, actually, that the government must show in order for fruits of an unlawful search to be admitted because of the warrant, and they have to show both of them for the evidence to be admitted. The first one is that the first unlawful search was close to the line of constitutional validity. The second one is that the search warrant was sought and executed in good faith. And so, of course, our argument on the not close to the line of constitutional validity is that this situation is very different from the court's cases where they have found exigent circumstances and Officer Bonnenberger's statements that he didn't think anyone was in the apartment because they would have left. And that seems like a reasonably prudent officer on the scene making his assessment. And so if this is not close to the line of constitutional validity, then the evidence should be suppressed. If the court disagrees with that, then the court must also examine whether the search warrant was sought and executed in good faith. As I mentioned, you can go to government exhibit 3I is the discussion. There's no mention of timeline, the lack of noise, the lack of light, or his belief that the occupants are gone when Officer Bonnenberger is talking to Detective Korn. And then I think critically, at least for Massey here, Officer Bonnenberger remains on the scene and reviews the warrant and helps execute it. So he is sort of the through line through this. And so that purpose of deterrence would be served by suppressing the evidence here because of the officer's improper conduct throughout this scenario. Thank you. Okay. And if there are no other questions, then I have reserved time for rebuttal. Okay. Very good. We'll see you back in about 20 minutes. Good morning. May it please the court. Stephanie Kinnard for the United States. I will begin by discussing exigent circumstances and how the decision of the magistrate judge and the district court was not clear error and then move on to the warrant. This court in United States versus Blount noted that a point that cannot be brushed aside, our standard of review is highly deferential. And in Blount, this court applied a clear error review to determining whether or not the district court was right in finding exigent circumstances. Judge Morales, you pointed out the key first indicator of exigent circumstances, and that was the existence of a bullet hole in a wall in a residential apartment. Now, the defendant argued in the reply brief that there aren't cases from this court where exigent circumstances are found unless officers can see or hear someone inside of the residence. But that is not the case. This court has consistently found that when there is reason to believe a firearm is present and here there wasn't just reason there was a bullet hole through the wall as well as reason to believe that someone could be inside who would be aware of police presence. And here police responded to a shooting in progress. They came with their sirens blaring. What do we do with the fact? Yes, the officer Bonenberger said he didn't believe anybody was in the apartment. So if he didn't believe anybody was in the apartment, then how can that be exigent? Your Honor? First, it is an objective standard. What he subjectively believed is not the test. But that is also one comment that is cherry picked from a very lengthy body cam video in which they are constantly discussing what is going on. So what happens is that 1936 on body cam three as he is knocking with a fellow officer, he comments there's probably no one there anymore. But at the motion to suppress, he testified at pages 802 and 8 29 that he believed there probably was a gun and that it could pose a threat to the officers. He agreed with the decision to evacuate when he and the fellow officer comment that maybe nobody's in there. And that very same minute they cover the people and they stand to the sides of the door. In addition, the information the officer Bonenberger had was from interviewing the witness into whom the bullet into whose home the bullet was fired. She tells him an exhibit three a that she doesn't know if someone still is in the apartment and exhibit three C. She says she doesn't know if anyone's still there. She heard noises. She heard people going away from the apartment, but she wasn't able to see or record. And then twice at 1928 and at 1944, she tells him she is concerned about the child who is in the apartment. So Officer Bonenberger may have commented at one point with an officer. Maybe nobody's still in there, but he never expressed that certainty. And he testified multiple times to the straight judge that he was concerned somebody was still inside. Uh, is there a shelf life on exigence? Is there a door? There is not a minute. There is not a hard time that we can because here, as your friend on the other side pointed out or cherry picked as you might put it, I don't know. That's what lawyers do. We come with the record and we look for things that are favorable, obviously. But based on the record, it looks like more than an hour passed between the time of that first shots fired call and when the apartment was, in fact, searched. And you just wonder is a search after an hour exigent. Is it urgent? So this court has not put the time limit. So, for example, in this was backless. It was 45 minutes in Tucson. It was 45 minutes. In this case, I think that the search and the timeline should actually be cabins into two pieces. So the officers arrive 37 minutes after the shot was fired, and immediately they do not dilly dally. They do not think there is time to waste the 1st 15 minutes. As you can see on body cameras three and four, a group of officers come to the hallway. They patrol the hallway. They secure the area. They are knocking on doors. They're going into Zuniga's apartment. They're looking at the trajectory of the bullets. They're gathering information and interviewing her. At the same time, other officers find the defendant. Things really pick up at 1939 when Sergeant Roberts arrived. He's the sergeant in charge and the person who can make decisions, and he knows it is an emergency, and treats it accordingly. At 1939-30, he orders evacuation of the apartments. 1941, he's interviewing the defendant. 1945, conferring with the other detective. 1947, interviewing again. By 1952, they have the key, and they are going into the apartment. And what Sergeant Roberts explains is when he arrived, he made the choice, and he explains this at page 873 of the record in 868. He made the choice to speak with the defendant first because with shots fired, he knew a protective sweep was likely, but he wanted more information so his officers didn't go in blind. And it is the conversations with the defendant that really heightened the exigency. So when officers speak to the defendant, they do not get any kind of reassurance that no is in the apartment. The defendant says three important things. First, that he hadn't been in his apartment in the last hour and had no idea what had been going on. Second, it wasn't his apartment. He didn't control access to it, and he gave that as the reason why he couldn't consent to a search. It belonged to his mom's friend, whose name he didn't actually know. And third, he said that he wanted, despite being allegedly surprised that there was a bullet hole in his wall, he wanted to be the one to go in and check things out, and he declined an offer for officers to go with him. And as Sergeant Roberts testified, that was not a reasonable response. And as is clear in his two conversations at 1941 and 1947 on body cam five, he makes it clear that he is concerned. The only reason the defendant would want to go in alone is that he knows who is inside the apartment and is attempting to hide that person. All of those things combined create exigent circumstances and Maldonado and Silva and Tamez and each one of those officers had only a reason to believe that a firearm was on the premise. They knew that if there was someone in the home, that person would know that the officers were there because they couldn't conceal their identity. In taking those factors together, this court held in every case that exigent circumstances were present. Menchaca Castrera is very, very different, and it needs to be understood in context to understand what this court meant when it said the mere possibility a shooter may be present is not enough. So Menchaca Castrera, a landlord, a landlord family comes to check on the premises because the tenant hasn't paid rent. They go into the home. They see a lot of marijuana. They tell the tenant they're calling the cops. He runs out. He begs them not to. They say we've already called. He runs to his car. He then tries to attack them with a tire iron. He then runs back to his car. He drives off. He leaves the door open. The court this court specifically held in finding no exigent circumstances. This was the usual case where there was proof there was no firearm because he attacked with a tire iron. The defendant wasn't barricaded. Instead, he had forewarning that the police were coming. So if he had time to leave, so did his accomplices, and he left the door wide open. So probably no one was there. The landlords who went inside the apartment told the police there was nobody else inside. And finally, when the officer performed the protective sweep, he didn't even take out his gun, which confirmed to this court that there was no genuine concern about safety from somebody being hidden inside. Um, yes, your honor. Colleague Judge Higginson is fond of asking at oral argument. He'll say, Counsel, what is your best case for X? So tell me, what is your best case? Um, supporting the presence of exigent circumstances when officers can't see anybody, they can't hear anybody inside the home. You mentioned earlier that we had some precedent. So do you? And Maldonado, I mentioned and blout I mentioned in part because those air cases where officers actually saw people come out and those people said nobody's there. And this court said you can still go in and perform a protective sweep even after people have exited. And here the officers didn't even have that certainty. They had a neighbor who heard some commotion and people running down the hall. And when asked, is anyone there said, I don't know. But I think the two strongest cases are United States versus Silva, where it really was an arrest on a porch with some information. A weapon could be involved, and that was enough to make sure that that house was empty and the police were not going to be hacked. And the rest was back where police came into a home. Um, smugglers had held undocumented immigrants hostage, and they came in and they dealt with the whole scene. And 45 minutes later, even though there was no indication of a threat or that anyone was still out there, they couldn't be sure there wasn't a smuggler hiding in a detached garage 12 ft away. And even though 45 minutes had passed and there'd been no noise and there'd been no sight, this court held it was appropriate to do a protective sweep of that separate structure. In this case, absolute certainty of a firearm. Police presence is known. They are not being discreet as they are investigating in the hallway and knocking on doors. And here you have a defendant who doesn't just say nobody is in there, but make statements that indicate he either has no way of knowing who was in the apartment an hour earlier or that there's a very real chance he may be hiding someone. And in this case, if you look at the body cam discussions that Sergeant Roberts has with Sergeant you Venno at 1945 and with Detective Corn at 1950, you will see that both of those officers to independently without being guided by Sergeant Roberts said we need to do a protective sweep and cannot wait for a warrant. This court does take into account the experience of those officers in here. Three independently determined a protective sweep was warranted. I do also quickly want to touch on the lack of movement and the lack of a response to knocking this court noted in United States versus troop that sometimes the lack of a response and movement in response to a knock at the door is that someone inside has committed a crime and knows that police officers are on the other side. And in this case, when Officer Bonnenberger, Officer Hedrick, Officer Albrecht were knocking on the door, it was clear from their chatter, their announcements, the radios going and the sirens blaring that it was officers on the other side of the door. As far as the light, officers couldn't figure out which window belonged to the defendant because the layout of the apartment complex was so confusing. So body cam four is that of Officer Bendela, who was outside with the defendant the whole time, and they asked the defendant at 1937 which window is 2204. And he says, I don't know. At 1941, when Sergeant Roberts interviews the defendant, he asked, which one's your window? And the defendant says, I don't know the layout, but my apartment must have the lights off. So it's the one without the lights on. And at 855 at pages 855 and 893 of the motion to suppress hearing when those officers were asked, Did you see movement? Did you see light? They refer back to the defendant's statement. They say, Well, the defendant told us that it was the dark window, but they didn't actually have any way to corroborate that because they couldn't figure out which one 2204 was. In light of all of this, in light of the deference given to the district court's decision, there is no clear error in finding that there were exigent circumstances that justified the 99 2nd protective sweep that the officers then proceeded to do of the apartment on the warrant question on Massey. The first question and Massey is was the search the allegedly unconstitutional search that led to that that was include that had evidence included in the warrant close enough to the line of validity. We submit that this court only has to address Massey if it determines that there were no exigent circumstances and that the initial search violated the Fourth Amendment. But if Massey does apply, then under United States versus Silva, there has just about Tucson, Maldonado, Blount, Thomas. All of those cases indicate when there is reason to believe there's a firearm in police presence is known. 45 minutes is not enough to destroy exigent circumstances. Here, the officers were there 10 minutes before that. Uh, it was at a minimum close enough to the line. Then the question becomes whether or not there was good faith. Now, this court directed in Warner that there are two things to look at. First, did the affluent say anything knowingly untrue or with reckless disregard for the truth in the affidavit? And the magistrate judge here had an opportunity to see Detective Soto testify and be examined and found that he did not act with reckless disregard. He acted carefully and preparing the warrants. But the second question is whether or not the officer at the scene laundered information, knew or had reason to know the search was unconstitutional, but didn't disclose that information in an attempt to launder the fruits of the poisonous tree. And in this case, I agree with opposing counsel that clip three I is what we need to look to. And their officer Bonnenberger tells the C. I. D. Everything he tells them. The defendant opposed us entering the resident in 2204. She heard people leave. We do not know if anyone is still in the apartment. He doesn't give timestamps and a timeline, but he explains that this is actually the second time he's been to the property on this bullet hole report. So makes it clear that this has been going on for a certain amount of time. And in Massey, this court explains that you don't need timestamps to have thoroughly explained the passage of time. As long as what you are communicating makes it clear that there was a passage of time, your obligation has met as far as the statements within the warrant. None of them are untrue. They do not meet the falsity requirement established by Frank's again. The magistrate judge found that there was no knowing misrepresentation, a reckless disregard in any event. Um, what about the statement that the police were given a key to the apartment? That statement I do concede is imprecise. It was obtained as the result of a consent search. Um, and in that case, you know, I think that that was an instance where imprecise language was used. However, it's also the least significant of the statements because it isn't required for probable cause. So if this court were to excise that statement from the warrant or were to go ahead and say, what if more information had been provided if there had been no omission and then the warrant had contained an explanation that was obtained pursuant to a consent search of his person, that would not have changed the probable cause calculus. And under Frank's, that is the third requirement that the defendant must must show. Um, one more. Yes, Your Honor. So what about the statement that the police discovered that someone inside apartment to to a four shot a firearm? They went through the wall. What about that statement that they discovered this? So I think that that was a fair account of the information in front of the officers. So at the time that they arrived, you see an exhibit one and an exhibit three a the witness who heard the shot, who was standing on the other side of the wall, she says, affirmatively, she has asked, you said the shot came from 2204. She says yes. And then the officers had an opportunity to examine the trajectory of the shots and determined it must have been shot just from the other side of the wall. So the combination of witness testimony that they had as well as the physical evidence of the wall, the fragments of the bullets did make that a fair statement and the contrary evidence. So the defendant is very specific about what was allegedly admitted. One is that Officer Bonnenberger allegedly did not believe the shot came from 2204. And I think there at best you have one statement versus his multiple other statements that he did believe there was a threat from 2204. But even more importantly, the defendant focuses on the alleged contrary evidence from the woman in 2206. So this is the resident that Officer Bonnenberger encounters the first time he comes to the complex. And when he talks to her and he describes her testimony at pages 785, 86 and 818, 19 of the record, he said she said she didn't know what she heard. She heard a pop. It could have been a gunshot. It may have come from outside or upstairs. And then once he saw the physical evidence of the bullet hole, he knew that her tentative it could have come from upstairs or outside didn't match the evidence. The officers don't even really bother discussing the ability of it coming outside because the outside wall is like this. The wall the bullet came through is like this. The bullet goes straight across. So it didn't go up to floors and magically travel. But they do discuss the possibility of it having come from 2306, her thought that maybe it came from above. And they discussed this on body cam three at 1932, 1937, 1942. They all object that as a possibility because the bullet was traveling and does a very shallow angle for it to have come from 2306. It would have gone through a wall through a ceiling for two more walls and then somehow come out going straight. So the officers reject that in the warrant. Okay, thank you. Thank you very much. Mr Kimmelman, you're back for five minutes of rebuttal. Thank you, Your Honor. One key difference in this these circumstances from many of the cases the government sites is that there was a shot fired and that happened many minutes before the government arrived. Now, why is that important? Because people thought, Oh, no, the police might come. We gotta leave. And so that sort of acts as the notice that there could be law enforcement on the scene. And there is an incentive at that moment for people to leave. And in fact, we know that many did because that's what the neighborhood heard, and that's what the ring camera captured. And so with this evidence of notice of law enforcement may be on the scene and then people leaving the apartment, then to extrapolate from Mr Turner's statements that he's not sure what happened in the apartment. He wasn't there. An articulable reason to believe someone is in the apartment. That is too far of a stretch, particularly when you start your argument off saying that we know that many people leave. We don't know that everyone is gone. We don't know that everybody left, but we have no reason to believe someone stayed. And and I think that is key with regard to the light Officer Bonnenberger did during his conversation with the tenant in 2204, I believe around 1722 or so, offered to flash his light through the window so that the officer standing outside could identify which apartment was Ms Zuniga's and then, you know, construct where Mr Turner's apartment was. We don't hear the entire end of that conversation, but we know that that effort was put forth and that Mr Turner said his apartment was dark. The officers accepted that, and we do know that the other officer in the hallway with Mr Bonnenberger looked several times through the peephole. So there was also a peephole which normally admits light if there is any light to believe. So everything indicates it was dark. It was quiet. This suggests it was empty. And once the officers arrived on the scene made a lot of noise, it remained quiet as well. And there was no information that the officers had. Unlike in Silva and those other cases, the government sites that another person could have been in the apartment or likely there's reason to believe another person was there. Um, they did not fact that the police knew that there were three people that lived there. And only one of them was outside, leaving the other two unaccounted for. True that they knew that. But again, people are not staying in their home the entire time. And when someone so so simply knowing that several people live in a house is not a reason to believe that two people are still in the house if a third person is outside. Um, I think there was also a conversation with Mr Turner and his girlfriend. But of course, the officers didn't need to credit that. But she was not even in town at the moment. Um, with regard to the Massey question of good faith of the search warrant affidavit, the government focuses on Detective Soto's good faith because he was the person who executed the who drafted the search warrant and sought it. But he did so based on the information he received from people at the scene. And I don't think Werner or Massey stand for the proposition that one law enforcement agency that's working together and relying on information collected from people at the scene. Um, then only look at the person who actually signs off that on the affidavit. Otherwise, it's too much of an incentive for the officers on the scene to withhold facts so that the executing officer can then be said to have executed and testified in good faith as to the facts on the ground. The government also focuses on the belief, subjective belief of Sergeant Roberts and other officers outside the apartment complex about the exigency. But I would submit the important factor are the facts that are shown on body cam exhibit three. That was Officer Bonnenbergers and the facts that he gathered that not all of the other officers knew. But he knew that there was one shot fired over an hour ago. There had been no more noise from that apartment and no articulable reason to believe someone was still in there who could threaten the officers with a gun. Okay, Mr. Thank you. Thank you very much. Uh, thanks to both sides. Really well argued and, um, the case is submitted.